UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OSCAR WESLEY SMITH,

     Applicant,

v.                                     CASE NO. 8:13-cv-1920-SDM-CPT

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

Smith applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 1) and challenges his conviction for second-degree murder, for which he was sentenced to life imprisonment.  Numerous exhibits ("Respondent's Exhibit __") support the response.  (Doc. 20)  The respondent concedes both the application's timeliness and the exhaustion of state remedies.  (Doc. 11 at 6–7)

## I. **BACKGROUND**[1]

Smith was convicted of murdering a homeless woman on a country road in Ruskin, Florida.  The victim was last seen alive around 10:00 p.m. on July 26, 2006, when several witnesses saw her walking alone near Interstate 75.  Approximately forty-five minutes later, a woman drove down 33rd Street in Ruskin and noticed "a truck stopped with its lights on and doors open and nobody inside."  (Respondent's

---

[1] This summary of the facts derives from the trial transcript.  (Respondent's Exhibit 1)

Exhibit 1 at 205)  Soon after, another woman drove past the same truck.  She saw a man "looking around on the ground for something" in front of the headlights. (Respondent's Exhibit 1 at 210)  The truck belonged to Smith.

Around 11:00 p.m., Smith flagged down a passing motorist on 33rd Street. He told the motorist (James Lilley) that "he saw a lady get out of a vehicle and a gentleman beat her with some object" as she ran "into the woods."  (Respondent's Exhibit 1 at 215)  Lilley called 911.  Before law enforcement arrived, Smith told Lilley that "he believed he had found her."  (Respondent's Exhibit 1 at 218)

Five minutes later, a sheriff's deputy arrived.  Smith directed the deputy to the victim, who was "tucked in a fetal position" in an "area that was mostly bush [with] some small trees."  (Respondent's Exhibit 1 at 236)  The deputy believed the victim might be alive and in need of medical assistance.  He asked Smith and another bystander (Sammy Zipperer) to help him "pull her from the underbrush." (Respondent's Exhibit 1 at 238)  The three dragged the victim approximately fifteen feet; Smith held "her right leg by the ankle or thereabouts."  (Respondent's Exhibit 1 at 239)  By this time, the victim was dead.  She had suffered "skull fractures and brain laceration" from several blows to the back of her head.  (Respondent's Exhibit 1 at 374)

Shortly after moving the body, the deputy found the murder weapon — an Estwing framing hammer with a broken claw.  At the time of the murder, Smith worked in construction.  His employer, Brian Leniton, testified that Smith owned an Estwing framing hammer, that Leniton had broken one of its claws during a job

three months before the murder, and that the murder weapon looked like Smith's broken hammer.  Maria Rodriguez, a co-worker, testified that she had seen the broken hammer in the bed of Smith's truck hours before the murder.  According to her, the hammer was identical to the murder weapon.  DNA from the murder weapon matched Smith's DNA, but the statistical significance of the match was low.[2]

Law enforcement recovered fingernail clippings from the victim's right hand.  Smith had left DNA on the "underside" of the clippings.  (Respondent's Exhibit 1 at 413, 423)  This match was far "more statistically significant than the one . . . from the hammer."  (Respondent's Exhibit 1 at 425)  The likelihood of finding another match on the clippings was "one in 3 trillion Caucasians, one in 2.4 trillion African Americans, and one in 1.3 trillion Southeastern Hispanics."  (Respondent's Exhibit 1 at 423)  The prosecution's DNA expert testified that "DNA underneath fingernails [did not] typically happen by casual contact."  (Respondent's Exhibit 1 at 424)  Instead, "more physical or forceful contact" was necessary.  (Respondent's Exhibit 1 at 424)  The morning after the murder, Smith had "scratch marks" on his arms and legs.  (Respondent's Exhibit 1 at 321–22)

Smith was arrested and charged with first-degree murder.  (Respondent's Exhibit 1 at 14)  The case went to trial.  Smith argued that his "actions on the night of July 26, 2006, were those of a good Samaritan."  (Respondent's Exhibit 1 at 161)

---

[2] The "estimated frequency" of the "DNA profile" on the hammer was "one in 23 Caucasians, one in 38 African Americans, and one in 33 Southeastern Hispanics."  (Respondent's Exhibit 1 at 410–11)

The jury found him guilty of the lesser-included offense of second-degree murder. (Respondent's Exhibit 1 at 560)  He received a sentence of life imprisonment. (Respondent's Exhibit 1 at 67)  The appellate court affirmed the conviction without a written opinion.  *Smith v. State*, 986 So. 2d 610 (Fla. 2d DCA 2008).  Smith unsuccessfully moved for post-conviction relief under Florida Rule of Criminal Procedure 3.850.  (Respondent's Exhibit 3)  This federal habeas application followed.  (Doc. 1)

## II. <u>STANDARD OF REVIEW</u>

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding.  *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's

application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied — the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable[;] . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question . . . ."); *Woods v. Donald*, 575 U.S. 312, 316 (2015) ("And an 'unreasonable application of' those

holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citing *Woodall*, 572 U.S. at 419).  *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case.  "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694.  A federal court must afford due deference to a state court's decision.  "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).  *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.").  When

the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.

In *per curiam* decisions without written opinions, the appellate court affirmed Smith's conviction and affirmed the denial of his Rule 3.850 motion for post-conviction relief. The appellate court's *per curiam* decisions warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), *and Bishop v. Warden*, 726 F.3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or "analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows

that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

Smith bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).

### III. <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Smith claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious

> that counsel was not functioning as the
> "counsel" guaranteed the defendant by the
> Sixth Amendment.  Second, the defendant
> must show that the deficient performance
> prejudiced the defense.  This requires
> showing that counsel's errors were so serious
> as to deprive the defendant of a fair trial, a
> trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Smith must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.  To meet this burden, Smith must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Smith cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *See Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable. *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

**Ground One:**

Smith contends that trial counsel provided ineffective assistance by failing to investigate "similar crimes." (Doc. 1 at 5)  According to Smith, the trial court "advised" counsel during a pre-trial hearing that he "might want to look into" two "separate murders similar to [Smith's] case." (Doc. 1 at 5–6)  The court allegedly stated that it had learned of these murders from "the newspaper." (Doc. 1 at 5)  Smith alleges that had counsel "investigated the matter," a reasonable probability exists that "evidence would have been found exonerating [him] of the crime at bar." (Doc. 1 at 6)

The post-conviction court held an evidentiary hearing on this claim.  The parties stated that they could not locate a transcript of the pre-trial hearing.[3]  (Respondent's Exhibit 3 at 690)  The prosecutor recalled, however, that the trial court had made an "offhand comment" about similar crimes during a "disposition hearing[ ]."  (Respondent's Exhibit 3 at 688)  Counsel likewise remembered "an off the cuff remark from the bench," but neither he nor the prosecutor could provide additional information about the court's remarks.  (Respondent's Exhibit 3 at 689)  Smith testified that the court had described "at least two" similar crimes involving "homeless women and . . . a hammer."  (Respondent's Exhibit 3 at 741)  One crime took place "in Orlando."  (Respondent's Exhibit 3 at 741)  Smith could not "remember" where the other crime occurred.  (Respondent's Exhibit 3 at 741)

---

[3] The record before the federal district court does not contain a transcript of the pre-trial hearing.

Finally, the lead detective on Smith's case testified that he was unaware of any "prior similar cases." (Respondent's Exhibit 3 at 733)

The post-conviction court rejected Smith's claim for lack of "prejudice." (Respondent's Exhibit 3 at 601) The court explained that Smith had "failed to present any evidence of similar crimes that [counsel] should have investigated." (Respondent's Exhibit 3 at 600–01) Therefore, Smith could not "establish prejudice" because he merely "speculate[d] that the outcome of the trial would have been different had counsel investigated these alleged similar crimes." (Respondent's Exhibit 3 at 601)

The rejection of this claim was reasonable. According to Smith, counsel could have used the "similar crimes" to argue that an alternative suspect killed the victim. (Doc. 1 at 6–8) A defendant may "introduce evidence of similar crimes committed by another person (rather than the defendant) to show that the defendant did not commit the offense for which he or she is being tried." *Newby v. State*, 272 So. 3d 862, 869 (Fla. 2d DCA 2019). But such evidence must meet a "strict standard of similarity." *Newby*, 272 So. 3d at 870. The defendant must show "a unique or 'fingerprint' type of connection between the crime being tried and the other act sought to be proved." *Newby*, 272 So. 3d at 871. "[A] mere general similarity will not render the similar facts legally relevant to show identity." *Peek v. State*, 488 So. 2d 52, 55 (Fla. 1986).

Smith fails to establish "a close similarity of facts" between the alleged similar crimes and his case. *State v. Savino*, 567 So. 2d 892, 894 (Fla. 1990). The record

contains almost no information about the prior cases. Smith asserted at the evidentiary hearing that the victims "were homeless women and that a hammer had been involved." (Respondent's Exhibit 3 at 741) But he provided no information about the circumstances of those cases — for example, whether the perpetrator knew the victim, whether the victim was discovered on the side of the road, whether the killing took place at night, whether the perpetrator left the murder weapon at the scene, or whether the perpetrator robbed or sexually assaulted the victim. Without additional details about the crimes, "[t]he purported similarities are too general and commonplace to establish the 'unique or fingerprint type' of similarity that is required for admission of [collateral act] evidence." *Peterson v. State*, No. 1D2023-2589, 2025 WL 15049, at *1 (Fla. 1st DCA Jan. 2, 2025); *see also Eliakim v. State*, 884 So. 2d 57, 61 (Fla. 4th DCA 2004) (finding that "'similar crimes' evidence was too general in nature and devoid of a close similarity of facts . . . to satisfy [the] relevancy requirement").

Thus, Smith fails to establish that the alleged similar crimes would have been admitted at trial. For that reason, the post-conviction court correctly found no prejudice from counsel's failure to investigate the prior cases. *See Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014) ("The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different.").

**Ground Two:**

Smith faults trial counsel for not moving to suppress "the DNA evidence." (Doc. 1 at 10)  According to Smith, the DNA evidence was inadmissible because the "crime scene" was "altered" and "contaminat[ed]" when he and another bystander helped move the victim's body.  (Doc. 1 at 11)  Smith maintains that a motion to suppress had a "reasonable probability" of success.  (Doc. 1 at 11)

The post-conviction court found that counsel was not "ineffective for failing to file a motion to suppress."  (Respondent's Exhibit 3 at 405)  According to the court, the "record" did not "establish that the crime scene was contaminated or altered when [Smith] assisted [the deputy] with removing the victim's body from the underbrush."  (Respondent's Exhibit 3 at 405)  As the court pointed out, the "DNA in question was found underneath the victim's fingernails."  (Respondent's Exhibit 3 at 404)  Only "forceful contact initiated by the victim . . . would result in [Smith's] DNA under [her] fingernails," and the victim "was not capable of . . . forceful physical contact" when she was pulled from the underbrush.  (Respondent's Exhibit 3 at 404)  Moreover, Smith "was not near the victim's arms," and he "had scratches" on his arms and legs.  (Respondent's Exhibit 3 at 405)  The court concluded that because the crime scene was not "contaminated or altered," no "valid basis existed to suppress the [DNA] evidence."  (Respondent's Exhibit 3 at 405)

This ruling was reasonable.  "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective assistance] claim . . . turns on state

law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017).  The post-conviction court found that a motion to suppress the DNA evidence would have failed because the crime scene was not "contaminated or altered."  (Respondent's Exhibit 3 at 405)  "Whether a motion to suppress the [DNA evidence] based on tampering would succeed is an issue of state law."  *Zayas-Acosta v. Sec'y, Dep't of Corr.*, No. 8:20-cv-2793-SDM-AAS, 2024 WL 987606, at *17 (M.D. Fla. Mar. 7, 2024).  Therefore, the post-conviction court "already has told us how the issue[ ] would have been resolved under Florida state law had [counsel] done what [Smith] argues he should have done."  *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005).

Because the post-conviction court "authoritatively decided as a matter of [Florida] law" that the DNA evidence was admissible, the remainder of the analysis is straightforward.  *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024).  "A lawyer cannot be deficient for failing to raise a meritless claim."  *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008).  As a result, the post-conviction court reasonably concluded that counsel was not deficient for failing to file a meritless motion to suppress.

**Ground Three:**

Smith contends that trial counsel provided ineffective assistance by failing to call Sammy Zipperer as a witness at trial.  (Doc. 1 at 16)  As noted above, Zipperer and Smith helped a sheriff's deputy move the victim's body from the underbrush.  Zipperer allegedly would have testified that Smith "came in contact with and

handled the victim's right arm." (Doc. 1 at 17)  By contrast, both the deputy and another bystander (James Lilley) testified at trial that Smith touched only the victim's ankle.  (Respondent's Exhibit 1 at 220, 239)  According to Smith, Zipperer's testimony would have supported his "defense of actual innocence" by showing that his DNA was transferred to the victim's fingernails when he helped move her body.  (Doc. 1 at 16–17)  Smith speculates, for example, that the victim's fingertips may have "landed on top of [his] bare feet" when he "let[ ] go" of her arm to "grab [her] leg."  (Respondent's Exhibit 3 at 534)

The post-conviction court rejected this claim for lack of prejudice.  As the court noted, the prosecution's DNA expert "testified that DNA underneath fingernails typically does not happen by casual contact but usually requires a more physical or forceful contact."  (Respondent's Exhibit 3 at 546)  Thus, according to the court, "even if [ ] Zipperer had testified that he saw [Smith] touching the victim's arm and leg areas, [his] testimony would not have refuted [the DNA expert's] testimony that a DNA transfer underneath a person's fingernail does not usually happen by such casual contact."  (Respondent's Exhibit 3 at 547)  Also, the court rejected as "speculat[ive]" Smith's "explanations as to why his DNA was under the victim's fingernails."  (Respondent's Exhibit 3 at 547)

The post-conviction court reasonably found no prejudice from the failure to call Zipperer at trial.  "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different."  *Reed*, 767 F.3d at 1261.  "It is not enough for the [petitioner] to

show that the errors had some conceivable effect on the outcome of the proceeding."
*Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [the federal district court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [petitioner] — that there was no substantial likelihood of a different result — was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Smith cannot meet this demanding standard. A fairminded jurist could conclude that Zipperer's proposed testimony would not have created a "reasonable probability" of a different verdict. *Reed*, 767 F.3d at 1261. Even if Zipperer had stated that Smith "handled" the victim's arm, the jury still would have heard (1) the DNA expert's testimony that "a DNA transfer underneath a person's fingernail does not usually happen by such casual contact" and (2) the lead detective's testimony that Smith had scratch marks on his arms and legs. (Respondent's Exhibit 3 at 547) In these circumstances, a fairminded jurist could find that Zipperer's proposed testimony would "have had an isolated, trivial effect" on "the entire evidentiary picture." *Strickland*, 466 U.S. at 696. Therefore, the post-conviction court acted reasonably in rejecting this claim.

**Grounds Four and Five:**

In ground four, Smith faults trial counsel for failing to hire a "crime scene specialist." (Doc. 1 at 21) According to Smith, this "specialist" would have testified (1) that Smith "could not be the perpetrator" because he had no "bruise[s]" or "fracture[s]" on his hands, (2) that the "blood found on" the murder weapon was "consistent with blood splatter," yet "no blood was found on [Smith's] hands or clothing," and (3) that "forensic science" proves Smith's DNA could have been transferred to the victim's fingernails through his "involvement in moving the body." (Doc. 1 at 22–23)

In ground five, Smith contends that counsel should have hired an "auto mechanic" to testify that his truck "regularly overheat[ed]" and had a malfunctioning "dome light." (Doc. 1 at 27–28) This testimony allegedly would have (1) supported Smith's assertion that he "was forced to pull off the side of the road as a result of his truck overheating" and (2) rebutted testimony from a state witness who said she had seen Smith's "truck stopped with its lights on and doors open and nobody inside." (Doc. 1 at 27; Respondent's Exhibit 1 at 205)

The post-conviction court rejected grounds four and five for similar reasons. The court explained that Smith "failed to present any evidence from a crime scene specialist" or "an automobile mechanic" at the evidentiary hearing. (Respondent's Exhibit 3 at 595, 598) Therefore, Smith could only "speculate that the outcome of the trial would have been different had counsel presented some unknown testimony from an automobile mechanic" or a "crime scene specialist." (Respondent's Exhibit

3 at 595, 598)  For that reason, the court concluded that Smith "failed to establish

prejudice."  (Respondent's Exhibit 3 at 595, 598)

The post-conviction court reasonably found no prejudice.  Smith never

identified any experts who could have provided the testimony he describes.  Nor did

he show that any crime scene specialist or mechanic "had actually reviewed the

evidence in his case." *Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir.

2016).  "Without some specificity as to the proposed expert[s'] testimony, any

assertion that [experts] would testify consistently with [Smith's] claims [was] mere

speculation and [did] not entitle him to [ ] relief." *Finch*, 643 F. App'x at 852.  Thus,

the post-conviction court reasonably concluded that Smith's speculative allegations

were insufficient to establish prejudice.  *See, e.g., Holt v. Sec'y, Fla. Dep't of Corr.*, 489

F. App'x 336, 338 (11th Cir. 2012) (state court reasonably rejected ineffective

assistance claim based on failure to retain expert because "[i]t [was] speculative that

an expert witness would in fact have testified" favorably to the defense); *Jimenez v.

Sec'y, Dep't of Corr.*, No. 8:19-cv-684-MSS-AEP, 2021 WL 5416150, at *9 (M.D. Fla.

Nov. 19, 2021) ("[I]n his post-conviction motion, [petitioner] neither identified an

expert who could have testified [favorably to the defense] nor presented an affidavit

or testimony to substantiate that testimony. Because [petitioner's] ineffective

assistance of counsel claim was speculative, the state court did not unreasonably

deny the claim.").

**Ground Six:**

Smith faults trial counsel for failing to "fully and properly impeach" the sheriff's deputy who responded to the crime scene. (Doc. 1 at 32) The deputy allegedly lied about Smith's "statements." (Doc. 1 at 33) At the crime scene, Smith told the deputy that he had seen the victim exit a "dark-colored car" followed by the perpetrator. (Doc. 1 at 32–33) At trial, however, the deputy denied that Smith had made this statement. (Doc. 1 at 33) Also, Smith claims that the deputy's "initial report" did not "include" his statement about the "dark-colored car." (Doc. 1 at 33) Finally, Smith contends that the deputy refused to "acknowledge his mistakes and failure to follow protocol" at the crime scene. (Doc. 1 at 33) Smith alleges that counsel provided ineffective assistance by failing to bring out these facts on cross-examination. (Doc. 1 at 33)

The post-conviction court held that "the record refute[d] [Smith's] claim." (Respondent's Exhibit 3 at 212) The court noted that "defense counsel properly impeached [the deputy] about the inconsistencies of his deposition testimony and his trial testimony." (Respondent's Exhibit 3 at 212) Moreover, "defense counsel . . . elicited testimony from [the deputy] that he did not include all of the statements made by [Smith] at the crime [scene] in the police report." (Respondent's Exhibit 3 at 212) The court pointed out that counsel "used these inconsistencies" in closing argument "to cast doubt on [the deputy's] testimony." (Respondent's Exhibit 3 at 212) Therefore, the court concluded that "counsel properly impeached" the deputy. (Respondent's Exhibit 3 at 212)

The rejection of this claim was reasonable.  To prevail on his assertion of ineffective assistance, Smith must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020).  Smith cannot meet this burden.  Counsel impeached the deputy's testimony about Smith's statements at the crime scene.  The deputy initially testified that Smith "never told" him that he had seen the victim "get out of a car and [get] beaten by a man." (Respondent's Exhibit 1 at 249)  Counsel responded by reading the deputy's deposition testimony:  "I remember and recall [Smith] telling me that he observed a car stop, a woman get out, a man come around the car, [and] the woman get out running to the area of where she was at."  (Respondent's Exhibit 1 at 249–50)

Also, counsel got the deputy to admit that he did not include any of Smith's statements in his report.  Counsel asked, "Am I correct . . . [that] nowhere in your report did you include any of the statements made to you at the scene by Oscar Smith?"  (Respondent's Exhibit 1 at 251)  The deputy responded, "You're correct," admitted that he had made "an oversight," and confirmed that he "now" recalled that Smith made the statements described in his deposition.  (Respondent's Exhibit 1 at 251)  Moreover, the deputy conceded that "in hindsight" he "should not have moved [the victim's] body when [he] saw it."  (Respondent's Exhibit 1 at 263) During closing argument, counsel drew on his cross-examination to argue that the deputy was "not a very credible witness."  (Respondent's Exhibit 1 at 513)

In short, counsel vigorously impeached the deputy and used the admissions he obtained to undermine the deputy's credibility.  In these circumstances, a reasonable jurist could conclude that counsel's conduct did not "amount[ ] to incompetence under prevailing professional norms." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014).  Therefore, the post-conviction court reasonably rejected Smith's assertion of ineffective assistance.[4]

## **Ground Seven:**

Smith contends that trial counsel rendered ineffective assistance by failing to move for a mistrial "based on a sleeping juror." (Doc. 1 at 35)  During cross-examination of the lead detective, the prosecutor approached the bench to inform the court that "the juror in the green shirt was nodding off." (Respondent's Exhibit 1 at 344)  The prosecutor noted that the juror had just "woke[n] up," but he was "not sure how long that had been going on." (Respondent's Exhibit 1 at 344)  The court asked defense counsel whether he would "be much longer with" the detective. (Respondent's Exhibit 1 at 344)  Counsel responded, "A few minutes, not super long." (Respondent's Exhibit 1 at 344)  The cross-examination resumed, and the matter of the sleeping juror did not come up again.

Smith argues that counsel should have moved for a mistrial because the juror "was asleep and therefore [in]attentive to a critical and material portion of the trial."

---

[4] Smith contends that counsel could have called Sammy Zipperer to show that he "handle[d] the victim's right arm." (Doc. 1 at 33)  This assertion is addressed above in the discussion of ground three.

(Doc. 1 at 36)  According to Smith, "no person found to be sleeping could be said to have the mindset necessary to render a fair and impartial verdict." (Doc. 1 at 36)

The post-conviction court took testimony on this claim at the evidentiary hearing.  Counsel testified that he declined to move for a mistrial for "two reasons." (Respondent's Exhibit 3 at 682)  First, he "believed that mistrials only benefit the state" by allowing "a chance to correct any errors" and by "eliminat[ing] the element of . . . surprise." (Respondent's Exhibit 3 at 682)  Moreover, counsel "believed that the case was going well for [ ] Smith, considering the evidence with which we had to deal." (Respondent's Exhibit 3 at 682)  Therefore, counsel "wasn't anxious to see this re-tried." (Respondent's Exhibit 3 at 682)  Second, counsel explained that he might have moved for a mistrial if the juror had displayed "major inattentiveness" or "had been out for a long time." (Respondent's Exhibit 3 at 683)  But he could not "recall anything that [ ]rose to that level," and he did not "want[ ] to wipe out the whole trial just because . . . someone may have been nodding off." (Respondent's Exhibit 3 at 683)

The post-conviction court held that counsel was not "deficient" for failing to move for a mistrial.  (Respondent's Exhibit 3 at 603)  The court found "credible" counsel's "testimony regarding his belief that mistrials only benefit the state and that the trial up to that point was going well for [Smith]." (Respondent's Exhibit 3 at 603)  Thus, the court concluded that counsel "made a sound strategic decision not to pursue a mistrial based on the fact that a juror was allegedly nodding or falling asleep." (Respondent's Exhibit 3 at 603)

This ruling was reasonable.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  A strategic choice "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it."  *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007).  "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices."  *Franks*, 975 F.3d at 1176.  Thus, Smith must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct."  *Franks*, 975 F.3d at 1176.

Smith cannot make this showing.  Counsel declined to move for a mistrial because he believed that "mistrials only benefit the state" and Smith's trial "was going well." (Respondent's Exhibit 3 at 682)  This assessment was reasonable. Counsel had obtained several key admissions by the time the sleeping juror was brought to the court's attention.  For example, the jury had learned that no blood, "tissue," or "gore" was found on the clothes Smith wore at the crime scene, that nothing in Smith's trailer "connect[ed]" him to the victim, and that during his four interviews with law enforcement, Smith repeatedly denied killing the victim. (Respondent's Exhibit 1 at 338–42)  Consequently, a fairminded jurist could conclude that "[some] competent counsel would have taken the action that [Smith's] counsel did take."  *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000); *see*

*also Cutaio v. Crews*, No. 3:11-cv-538-LAC-EMT, 2013 WL 1278965, at \*20, \*26 (N.D. Fla. Mar. 4, 2013) (no deficient performance for failing to move for mistrial based on sleeping juror because, among other things, "[a] mistrial, if granted, would have wiped the slate clean, jeopardizing the victories the defendant had obtained"), *adopted by* 2013 WL 1248241 (N.D. Fla. Mar. 27, 2013).

**Ground Eight:**

Smith faults trial counsel for failing to request a *Frye*[5] hearing to challenge "discrepancies" in the "DNA test results." (Doc. 1 at 40) As noted above, testing at the Florida Department of Law Enforcement ("FDLE") revealed a statistically insignificant amount of Smith's DNA on the murder weapon. (Respondent's Exhibit 1 at 410–11) Smith alleges that after this test was performed, law enforcement sent the DNA sample from the murder weapon to ReliaGene Corporation for further testing. (Doc. 1 at 40) ReliaGene's test "yielded inconclusive results." (Doc. 1 at 41) Smith argues that counsel should have requested a *Frye* hearing to determine whether the FDLE "followed appropriate [testing] procedures." (Doc. 1 at 41)

Also, Smith points to alleged "inconsistencies" in the DNA results from the victim's fingernail clippings. (Doc. 1 at 41) The prosecution's DNA expert testified that the first time she tested the fingernail clippings, "there wasn't enough DNA" to "fully determine the DNA profile of the foreign contributor." (Respondent's Exhibit

---

[5] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). At the time of Smith's trial, *Frye* governed the admission of expert testimony in Florida state court. *See DeLisle v. Crane Co.*, 258 So. 3d 1219, 1227 (Fla. 2018) ("Following our repeated affirmations of the *Frye* rule, in 2013 the Legislature amended section 90.702 to incorporate *Daubert* in the Florida Rules of Evidence.").

1 at 443)  She therefore asked law enforcement to re-submit the samples so that she could obtain "more DNA." (Respondent's Exhibit 1 at 443–44)  When she ran the test again, she found a match between the DNA profile on the fingernail clippings and Smith's DNA.  (Respondent's Exhibit 1 at 423)  According to Smith, counsel should have requested a *Frye* hearing to challenge these allegedly inconsistent results. (Doc. 1 at 41-42)

The post-conviction court found that counsel was not "ineffective for failing to . . . request a *Frye* hearing."  (Respondent's Exhibit 3 at 205)  The court first discussed the DNA testing of the murder weapon.  The court cited trial testimony from the prosecution's DNA expert, who explained that "the testing done by ReliaGene was different [from] the testing performed at the FDLE laboratory." (Respondent's Exhibit 3 at 203)  Specifically, ReliaGene used a "specific Y chromosome DNA test," while the FDLE used a "different technique" involving "short tandem repeat[s]."  (Respondent's Exhibit 3 at 203–04)  ReliaGene and the FDLE thus did not reach "inconsistent conclusions."  (Respondent's Exhibit 3 at 204)  Moreover, the court pointed out that "short tandem repeat" analysis "is the standard used in the forensic community, that the FDLE is an accredited laboratory," and that the prosecution's DNA expert said she "followed all of the standard procedures."  (Respondent's Exhibit 3 at 204 n.6)  Therefore, the court held that Smith was not entitled to a *Frye* hearing "regarding this issue" and counsel was not deficient for failing to request one.  (Respondent's Exhibit 3 at 204)

The court likewise found that Smith was not entitled to a *Frye* hearing on the DNA results from the fingernail clippings.  (Respondent's Exhibit 3 at 205)  The court noted that the "two tests were conducted solely because insufficient DNA amounts were used for the first test."  (Respondent's Exhibit 3 at 205)  Furthermore, the "tests did not produce inconsistent results."  (Respondent's Exhibit 3 at 205)  Instead, as the court explained, "the first test was inconclusive because the DNA mixture was not large enough and [ ] the second test involved a larger mixture."  (Respondent's Exhibit 3 at 205)  The court thus held that counsel was not deficient "for failing to . . . request a *Frye* hearing where there were no inconsistent test results."  (Respondent's Exhibit 3 at 205)

These rulings were reasonable.  Smith's ineffective assistance claim "turns on [an issue of] state law" — whether he was entitled to a *Frye* hearing on the DNA results from the murder weapon and the fingernail clippings.  *Pinkney*, 876 F.3d at 1295.  The post-conviction court found that Smith was not entitled to a *Frye* hearing.  (Respondent's Exhibit 3 at 204–05)  That determination is binding on federal habeas review.  *See Walker v. Sec'y, Dep't of Corr.*, No. 8:05-cv-1539-EAK-MAP, 2007 WL 1747181, at *10 (M.D. Fla. June 18, 2007) ("The state decision in [petitioner's] case settles that as a matter of state law, the trial court was not obliged to conduct a *Frye* hearing before the state adduced testimony.").  Therefore, the post-conviction court reasonably concluded that counsel did not provide ineffective assistance by failing to make a meritless request for a *Frye* hearing.  *See Knight v. Jones*, No. 17-61921-CIV, 2018 WL 11656388, at *13 (S.D. Fla. Apr. 30, 2018)

("[T]he state court determined the Petitioner did not show . . . deficient performance because any *Frye* request would have proven fruitless.  Accepting as true the state court's determination regarding the fruitlessness of a *Frye* hearing, this analysis is the correct application of the first prong of *Strickland*."), *aff'd sub nom. Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322 (11th Cir. 2019).

**Ground Nine:**

Smith faults trial counsel for failing to present evidence about "paint splatter" on the murder weapon.  (Doc. 1 at 45–46)  As noted above, the murder weapon was an Estwing framing hammer with a broken claw.  Smith owned an Estwing framing hammer, and his employer broke one of its claws three months before the murder.  Maria Rodriguez, a co-worker, testified that she had seen Smith's broken hammer in the bed of his truck hours before the murder.  According to Rodriguez, she retrieved the hammer from the truck and "brought it" to Smith.  (Respondent's Exhibit 1 at 299)  Also, she testified that she "thought" she had spilled "some Behr paint" on the hammer.  (Respondent's Exhibit 1 at 306)  Rodriguez claimed that the hammer was identical to the murder weapon.

Smith notes that the FDLE compared "paint samples taken from the job that [he] and [ ] Rodriguez worked" with "small droplets of paint" from the murder weapon.  (Doc. 1 at 46)  The FDLE concluded that the "white paint spots" on the murder weapon "did not originate from" the samples taken from the job site. (Respondent's Exhibit 3 at 126)  According to Smith, counsel provided ineffective assistance by failing to present "this important fact" at trial.  (Doc. 1 at 46)

The post-conviction court heard testimony on this claim at the evidentiary hearing.  Counsel acknowledged that Rodriguez "thought . . . she may have spilled paint" on Smith's broken hammer.  (Respondent's Exhibit 3 at 706)  Also, counsel conceded that the "paint" from the job site "didn't match" the paint samples taken from the murder weapon.  (Respondent's Exhibit 3 at 707)  Counsel believed, however, that the absence of a match "was a minor point, considering the other evidence the [murder weapon] did contain" — that is, the broken claw.  (Respondent's Exhibit 3 at 706)  As counsel explained, Rodriguez recognized the murder weapon as Smith's broken hammer because of this "unusual" characteristic.  (Respondent's Exhibit 3 at 713)  And Rodriguez "had no bias, interest, [or] motive in testifying," nor had she "fall[en] out with" Smith.  (Respondent's Exhibit 3 at 713)

The post-conviction court rejected this claim because Smith "failed to establish deficient conduct."  (Respondent's Exhibit 3 at 592)  According to the court, counsel "did not call an expert to testify that the paint on the hammer did not match the paint from the [job site] because [ ] Rodriguez only [said] that she *thought* she spilled paint on the hammer."  (Respondent's Exhibit 3 at 591)  Moreover, "the paint on the hammer was a minor issue compared with the other evidence that the hammer belonged to [Smith] — mainly the fact that the hammer was unique in that it only had one claw."  (Respondent's Exhibit 3 at 591)  Therefore, the court concluded that counsel "made a sound strategic decision not to pursue expert testimony on the paint identification at [Smith's] trial."  (Respondent's Exhibit 3 at 591)

The rejection of this claim was reasonable. "The [*Strickland*] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *White*, 972 F.2d at 1220. "[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. Smith cannot meet this standard. Rodriguez testified only that she *thought* she had spilled paint on Smith's broken hammer. As counsel explained, she "didn't say absolutely there was paint spilled on it." (Respondent's Exhibit 3 at 706–07) Thus, a fairminded jurist could conclude that some "competent counsel" would refrain from presenting evidence that the paint on the murder weapon did not match paint samples from the job site. *Chandler*, 218 F.3d at 1315.

Furthermore, "*Strickland* permits attorneys to choose between viable avenues of defense." *LeCroy v. United States*, 739 F.3d 1297, 1313 (11th Cir. 2014). Consequently, "attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another." *LeCroy*, 739 F.3d 1313. Counsel vigorously argued in closing that the murder weapon was not "Oscar Smith's hammer." (Respondent's Exhibit 1 at 504) He pointed out that the "left prong" of the murder weapon was broken, yet Smith's employer was equivocal about whether he had broken the right or left prong of Smith's hammer. (Respondent's Exhibit 1 at 504) Counsel argued that if Smith had killed the victim, he must have "grip[ped] [the hammer] pretty tightly to swing it." (Respondent's Exhibit 1 at 508) Yet, as counsel noted, the DNA evidence linking Smith to the murder weapon was weak,

and "tens of millions of people in the world . . . would have that same DNA."
(Respondent's Exhibit 1 at 507)  Finally, counsel noted that law enforcement never
tried to determine whether Rodriguez left DNA on the murder weapon.  This was
"important," counsel explained, because Rodriguez claimed to have "handled"
Smith's hammer "hours before the murder."  (Respondent's Exhibit 1 at 508)  A
fairminded jurist could conclude that this defense strategy "fell within the wide range
of reasonable professional conduct." *Franks*, 975 F.3d at 1176.

**Ground Ten:**

Smith faults trial counsel for not moving to compel the production of "all
scientific documentation authenticating" the DNA results in his case.  (Doc. 1 at 50–
51)  Alternatively, he argues that counsel should have requested a *Richardson*[6]
hearing to address the prosecution's alleged failure to produce this material.  (Doc. 1
at 50–51)  According to Smith, the "scientific documentation" — "graphs" of
"chromosome[s]" — would have supplied "exculpatory evidence essential to
properly prepare for trial and assist the jury with its comprehension of the DNA
evidence."  (Doc. 1 at 50–51)

Even under *de novo* review, this claim fails.  *See Berghuis v. Thompkins*, 560 U.S.
370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by
engaging in *de novo* review . . . because a habeas petitioner will not be entitled to a
writ of habeas corpus if his or her claim is rejected on *de novo* review.").  Counsel

---

[6] *Richardson v. State*, 246 So.2d 771 (Fla. 1971).  In Florida, a *Richardson* hearing addresses
discovery violations and non-compliance with discovery requests.  *See Andres v. State*, 254 So. 3d 283,
293 (Fla. 2018).

testified at the evidentiary hearing that he hired an expert to "see if [the defense] could challenge" the prosecution's DNA evidence. (Respondent's Exhibit 3 at 703) Counsel explained that "[a]ny time we have DNA in a murder case we're . . . almost always [going to] have our own expert examine it." (Respondent's Exhibit 3 at 703) The expert in Smith's case received the results from the FDLE and ReliaGene and "confirmed what both . . . found regarding the DNA." (Respondent's Exhibit 3 at 723; *see also* Respondent's Exhibit 3 at 703–04) Smith now complains that counsel did not obtain additional "scientific documentation," but he fails to explain how counsel could have known this material was necessary to test the DNA results. (Doc. 1 at 50–51) Indeed, the defense expert informed counsel that those results were "accurate." (Respondent's Exhibit 3 at 703) Therefore, counsel plainly acted "within the wide range of reasonable professional conduct" in handling the DNA evidence.[7] *Franks*, 975 F.3d at 1176.

**<u>Ground Eleven:</u>**

Smith faults trial counsel for not moving to dismiss the indictment. (Doc. 1 at 53) According to Smith, the prosecution's "theory" of the case "cannot stand" because he "could have" left DNA under the victim's fingernails when he "mov[ed]

---

[7] Smith asserts that "computer-generated graphs" would have helped the jury understand the DNA evidence, but he fails to explain how graphs would have accomplished that task. (Doc. 1 at 50–51)

[her] body." (Doc. 1 at 54)  Smith argues that the case likely "would not have gone to trial" had "counsel moved for a dismissal" on this basis.[8] (Doc. 1 at 54)

The post-conviction court held that "the record refute[d] [this] claim." (Respondent's Exhibit 3 at 201)  The court cited testimony from the prosecution's DNA expert, who explained that "DNA underneath fingernails does not typically happen by casual contact, but rather by a 'more physical or forceful contact.'" (Respondent's Exhibit 3 at 201 (citation omitted))  According to the court, counsel had no basis to "file a motion to dismiss [because] there was expert testimony as to . . . how the DNA was obtained and why it was unlikely that casual contact caused the DNA transfer." (Respondent's Exhibit 3 at 201–02)  Therefore, counsel "was not deficient." (Respondent's Exhibit 3 at 201–02)

The rejection of this claim was reasonable.  Smith's allegation of ineffective assistance "turns on [an issue of] state law" — whether a motion to dismiss the indictment for lack of evidence would have succeeded.  *Pinkney*, 876 F.3d at 1295. The post-conviction court "authoritatively decided as a matter of [Florida] law" that the proposed motion would have failed.  *Calhoun*, 92 F.4th at 1351.  "A lawyer cannot be deficient for failing to raise a meritless claim."  *Freeman*, 536 F.3d at 1233. Thus, the post-conviction court correctly concluded that counsel was not deficient for failing to move to dismiss the indictment.  *See Garcia v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2374-KKM-AAS, 2021 WL 1516070, at *7 (M.D. Fla. Apr. 16, 2021) ("Because

---

[8] Under Florida law, a motion to dismiss an indictment "is analogous to a motion for summary judgment in a civil case."  *State v. Petagine*, 290 So. 3d 991, 993 (Fla. 1st DCA 2020).  The motion must be denied if "the state shows the barest *prima facie* case."  *Petagine*, 290 So. 3d at 994.

the state court has determined that a motion to dismiss would not have been granted, this Court cannot reevaluate [the] motion's chance of success under Florida law."), *aff'd*, No. 21-12461, 2023 WL 5927136 (11th Cir. Sept. 12, 2023).

**<u>Ground Twelve:</u>**

Smith asserts that trial counsel rendered ineffective assistance by advising him not to testify at trial. (Doc. 1 at 56) According to Smith, counsel told him that "the state failed to prove its case beyond a reasonable doubt," that "he did not need to testify," and that testifying "would harm the defense." (Doc. 1 at 56) Smith argues that had counsel not "misadvised" him, the jury "would have heard the facts" — that he was a good Samaritan who witnessed the murder and tried to help. (Doc. 1 at 57)

The post-conviction court heard testimony on this claim at the evidentiary hearing. Counsel explained that he advised Smith not to testify for several reasons. (Respondent's Exhibit 3 at 685) First, Smith had a "prior felony conviction that could be brought up to impeach him." (Respondent's Exhibit 3 at 684) Second, during a meeting at the county jail, Smith had "told us spontaneously that he may have done this murder." (Respondent's Exhibit 3 at 684) Counsel did not "want him possibly blurting that out" at trial. (Respondent's Exhibit 3 at 684) Third, counsel "felt there were certain things . . . that [Smith] would have to be cross-examined about if he testified that he could not answer." (Respondent's Exhibit 3 at 725) Specifically, counsel was "afraid" that the prosecution would ask "how his DNA got under the victim's nails." (Respondent's Exhibit 3 at 686) Counsel explained that a defense expert had received "Smith's version [of events] and said

there's no way that [his] DNA got under the nails of the victim if [he] was telling the truth." (Respondent's Exhibit 3 at 686)

Even under *de novo* review, Smith's assertion of ineffective assistance lacks merit. "A criminal defendant has a fundamental constitutional right to choose whether to testify in his own defense." *United States v. Anderson*, 1 F.4th 1244, 1253 (11th Cir. 2021). "Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf." *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992). "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Teague*, 953 F.2d at 1533. "Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." *Teague*, 953 F.2d at 1533. The touchstone of the analysis is whether "counsel's performance fell below an objective standard of reasonableness." *Teague*, 953 F.2d at 1534.

Counsel acted reasonably when he advised Smith not to testify. Several strategic considerations supported this advice. If Smith had testified at trial, the prosecution likely would have impeached him with his prior felony conviction. "There are good tactical reasons why it may not be best for the defendant to testify in some circumstances," including "if the defendant might be prejudiced by revelation

of [a] prior conviction[ ]." *Teague*, 953 F.2d at 1533 n.9; *see also Brown v. Sec'y, Dep't of Corr.*, No. 8:09-cv-934-SDM-AEP, 2012 WL 2936167, at *6 (M.D. Fla. July 18, 2012) ("[P]reventing the disclosure of prior convictions that would prejudice the defendant is a sensible reason for advising against a defendant testifying.").

Furthermore, Smith "spontaneously" told defense counsel "that he may have done this murder." (Respondent's Exhibit 3 at 684)  Thus, counsel reasonably feared that Smith "might get up there . . . and say . . . maybe I did do this." (Respondent's Exhibit 3 at 685)  As counsel explained, "that would've been the end right there." (Respondent's Exhibit 3 at 685)  In these circumstances, counsel did not provide ineffective assistance by advising Smith not to testify. *Cf. United States v. Bland*, 23 F.3d 403, 403 (4th Cir. 1994) (holding that counsel "did not render deficient representation in advising [defendant] not to testify" because he had "confessed his guilt to counsel").

Lastly, counsel reasonably believed that Smith would face a damaging cross-examination if he testified.  "The tactical decision to advise [Smith] against testifying because of the dangerous cross-examination that could ensue . . . cannot be a sound basis for a claim of ineffective assistance of counsel." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1319 (11th Cir. 2005).

**<u>Ground Thirteen:</u>**

Smith argues that the prosecution committed misconduct during closing argument.  (Doc. 1 at 60)  According to him, the prosecution (1) "improperly bolstered the credibility" of James Lilley (the motorist Smith flagged down),

(2) "improperly ridiculed the defense theory of acquittal," and (3) shifted the burden of proof to Smith. (Doc. 1 at 60–62) The appellate court rejected this claim in a *per curiam* decision without a written opinion. *Smith v. State*, 986 So. 2d 610 (Fla. 2d DCA 2008). Consequently, Smith must show that the state court's decision possessed "no reasonable basis." *Richter*, 562 U.S. at 98. He cannot meet his burden.

"The reversal of a conviction . . . is warranted when improper comments by a prosecutor have so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker*, 244 F.3d at 838. "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). "A prosecutor's remarks, suggestions, insinuations, and assertions are improper when they are calculated to mislead or inflame the jury's passions." *United States v. Azmat*, 805 F.3d 1018, 1044 (11th Cir. 2015). "Substantial rights are prejudiced when there is a reasonable probability . . . that, but for the remarks, the outcome of the trial would have been different." *United States v. Nerey*, 877 F.3d 956, 970 (11th Cir. 2017).

First, the prosecution did not improperly bolster Lilley's credibility. As noted above, Lilley observed Smith and another bystander assist the deputy in moving the victim's body. Lilley testified that Smith touched only the victim's ankle. (Respondent's Exhibit 1 at 220) During closing argument, the prosecution contended that the crime scene was not "contaminated" because Smith never

touched the victim's hands.  (Respondent's Exhibit 1 at 546)  The prosecution

supported this argument by citing Lilley's testimony (Respondent's Exhibit 1 at 546–

47):

> Who is independent in this situation?  James Lilley, the
> good Samaritan.  He stuck around.  He didn't know what
> the heck was going on, but he knew this guy was acting
> strange and nervous and telling me to call 911.  James
> Lilley, well, I'm not going to come out of my truck until
> law enforcement comes.  James Lilley, who is like I'm not
> the type of person who touches dead bodies.  James Lilley
> is completely independent of this entire investigation; he
> took the stand and told you [Smith] pulled her out by the
> ankles.  There is no evidence to suggest whatsoever that
> her arms were ever touched.

These remarks did not constitute improper bolstering.  "A prosecutor's

remarks are improper if they attempt to bolster the credibility of a witness based on

the government's reputation or through alluding to evidence not admitted at trial."

*United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009).  "To determine if the

government improperly vouched for a witness, the court must decide whether a jury

could reasonably believe that the prosecutor was indicating a personal belief in the

witness'[s] credibility."  *Lopez*, 590 F.3d at 1256.  "This prohibition against vouching

does not, however, forbid prosecutors from arguing credibility; rather, it forbids

arguing credibility based on the reputation of the government office or on evidence

not before the jury."  *Lopez*, 590 F.3d at 1256.

The challenged remarks did not "amount to an explicit, personal guarantee of

credibility, such as assuring the jury that the prosecution would not have brought the

case unless the defendant was actually guilty."  *United States v. Hernandez*, 921 F.2d

1569, 1573 (11th Cir. 1991). Instead, the remarks invited the jury to find Lilley

credible "based on [his] behavior on the stand and the evidence admitted." *United*

*States v. Hope*, 608 F. App'x 831, 841 (11th Cir. 2015). "[A]n attorney is allowed to

argue . . . credibility of witnesses or any other relevant issue so long as the argument

is based on the evidence." *Miller v. State*, 926 So. 2d 1243, 1254–55 (Fla. 2006).

Second, the prosecution did not "improperly ridicule[ ] the defense theory of

acquittal." (Doc. 1 at 61)  The prosecution argued that Smith's "version of events

[was] not reasonable" (Respondent's Exhibit 1 at 493–94, 533):

> Oscar Smith wants you to believe poor, poor me.  I am the
> victim of this horrible circumstance.
>
> I'm the most unfortunate man in America because as I'm
> driving my broken-down truck for a leisurely drive late at
> night, I happen upon a domestic dispute.  This little black
> car comes peeling around the corner, a woman jumps out,
> a man, ironically looking very similar to myself, . . . just
> happens to be chasing this woman and kills her, and then
> she runs into the woods and it just so happens that the
> murder weapon here, the hammer that is used, what a
> coincidence.  Oh, my gosh, it's the exact same hammer . . .
> that I use too, in my construction job.  And it's a
> coincidence that this hammer, this murder weapon is
> broken in the exact same manner as my hammer was
> broken just months ago.
>
> And ladies and gentlemen . . . gosh darn it, it is just a
> coincidence that the one location, the one location of
> DNA that's foreign to the victim that's found on this
> ironically strikingly similar hammer to the one that I own,
> well, gosh it matches me.  I'm just the victim of
> unfortunate circumstances.
>
> It almost sounds like a Hollywood movie, but it's not.
> Using common sense, using rationality, comparing the
> defendant's statement to the other evidence that has been
> presented in this case, ladies and gentlemen, his version of

events is not reasonable.  His version of events is not
logical.

. . .

The story that the defendant voluntarily stuck around the
scene to tell is unbelievable.  And I'm not using that
adjective to describe some great meal, some unbelievable
meal you just had[.]  I mean, seriously, it is not believable.
You should not believe the things that Oscar Smith said.

These remarks were not improper.  "The proper exercise of closing argument
is to review the evidence and to explicate those inferences which may reasonably be
drawn from the evidence."  *Silvia v. State*, 60 So. 3d 959, 977 (Fla. 2011).  Here, the
prosecutor appropriately "comment[ed] on the evidence and express[ed] the
conclusions he [believed] the jury should draw from the evidence."  *Crenshaw v. Sec'y,
Fla. Dep't of Corr.*, No. 16-17735-D, 2017 WL 6761058, at *6 (11th Cir. Oct. 18,
2017).  A prosecutor is not limited to "flat, robotic recitations of 'just the facts.'"
*Diaz v. State*, 797 So. 2d 1286, 1287 (Fla. 4th DCA 2001).  To the contrary, closing
argument "is a time for robust [and] vigorous challenging . . . of an opponent's
ideas."  *Diaz*, 797 So. 2d at 1287.

Third, the prosecution did not shift the burden of proof to Smith.  During
closing arguments, "prosecutors must refrain from making burden-shifting arguments
which suggest that the defendant has an obligation to produce any evidence or to
prove innocence."  *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).  That
did not happen here.  Smith complains that the prosecution (1) tried to explain the
absence of blood on his clothes by describing his "filthy paint-spattered body," (2)
argued that any uncertainty about which prong of the hammer was broken did not

"definitive[ly]" prove Smith "did not . . . kill" the victim, and (3) maintained that "there [was no] innocent reason why . . . Smith should have his DNA lodged underneath" the victim's fingernails. (Respondent's Exhibit 1 at 530, 532–33, 547) None of these remarks "suggest[ed] that [Smith] ha[d] an obligation to produce any evidence or to prove innocence." *Simon*, 964 F.2d at 1086.

Even if the challenged remarks did shift the burden of proof, Smith is entitled to no relief because the remarks did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). After closing arguments, the court instructed the jury (1) that the presumption of innocence "stay[ed] with [Smith] through each stage of this trial and as to each material allegation of the indictment until it [was] overcome by the evidence to the exclusion of and beyond a reasonable doubt," (2) that the prosecution had "the burden of proving that the crime with which [Smith was] charged was committed and that he [was] the person who committed the crime," and (3) that Smith "was not required to present evidence or prove anything." (Respondent's Exhibit 3 at 549) "[J]urors are presumed to follow the court's instructions." *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001). Thus, a reasonable jurist could conclude that any potential prejudice from the prosecution's remarks was "cured by [the] court's instruction regarding the burden of proof." *Simon*, 964 F.2d at 1087; *see also United States v. Zitron*, 810 F.3d 1253, 1259–60 (11th Cir. 2016) ("[T]he court's instruction that [defendant] did 'not have to prove his innocence or produce any evidence at all' and that the government had to 'prove

guilt beyond a reasonable doubt' cured any prejudice that may have resulted from [the potentially burden-shifting] comments.").

## IV. CONCLUSION

Smith's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Smith and **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Smith fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate both the merits of the grounds and the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Smith must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on February 11, 2025.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE